```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA


BRUCE W. MAJER, et al.          :          CIVIL ACTION
                                :
          v.                    :
                                :
SONEX RESEARCH, INC., et al.  :          NO. 05-606
```

<u>MEMORANDUM AND ORDER</u>

McLaughlin, J.                                January 31, 2008


          This case involves the claims of Bruce W. Majer, Allen
W. Fortna, and the Hermitage Partnership ("Hermitage"), against
Sonex Research, Inc. ("Sonex") and four affiliated individuals:
Roger D. Posey, Jim Z.I. Williams, George E. Ponticas, and Andrew
A. Pouring.  The plaintiffs invested in Sonex through a private
placement in 2004.  They allege that the defendants
misrepresented Sonex's financial and personnel situation while
soliciting the plaintiff's investment.  The plaintiffs claim that
their investments are now worthless, and have alleged that the
defendants' actions constitute fraud in violation of federal
securities law, Pennsylvania securities law, and common law.  In
addition, the plaintiffs make state law claims of negligent
misrepresentation, breach of contract, and rescission of their
subscription agreements.

          On July 17, 2006, the Court granted the individual
defendants' motion to dismiss for failure to state a claim upon

which relief can be granted.  The Court concluded that the plaintiffs' allegation of misrepresentation and omissions failed to state a claim under the federal and state securities laws and under the common law.  Majer v. Sonex Research, Inc., No. 05-606, 2006 WL 2038604, at *8, *13 (E.D. Pa. July 19, 2006).

The plaintiffs have amended their complaint and added detail to their allegations.  These additional details do not add enough to state a claim, and the Court will dismiss with prejudice the amended complaint for failure to state a claim under which relief can be granted.

I.   Facts

The plaintiffs allege the following facts in the amended complaint.[1]

Sonex, founded in 1980, is an engineering research and development firm that holds patented technology for in-cylinder control of ignition and combustion in various kinds of engines. The company went public in the mid-1980s, but remained a small operation, with only one office/warehouse in Annapolis, Maryland and a small staff.  By the late 1980s, Sonex's focus had narrowed

---

[1]   In considering the defendants' motion to dismiss, the Court must accept the allegations in the amended complaint as true and draw all reasonable inferences in favor of the plaintiffs.  Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004); In re Rockefeller Ctr. Props., Inc., Sec. Litig., 311 F.3d 198, 215 (3d Cir. 2002).

into studying the effects of changes in the chemical and fuel disbursement characteristics within the combustion chamber. Am. Compl. ¶¶ 21-22, 24, 40.

Defendant Andrew Pouring, a former aerospace engineering professor, co-founded Sonex and at the time of the filing of the amended complaint served as its Chairman, Chief Executive Officer, and President.  Defendant George Ponticas is a Certified Public Accountant.  Sonex hired him as its Comptroller and Assistant Secretary in 1987, and he because the Chief Financial Officer and Secretary in 1991.  Id. ¶¶ 22-23, 25.

In 2003, Pouring and Ponticas hired Global Equity Consultants ("Global"), led by Jim Rose, to help reposition Sonex's business from a research and development firm to a full-service firm that brought the technologies it developed to market.  Id. ¶¶ 26, 29.

On Global's recommendation, Sonex hired Roger Posey as President in 2004.  Rose had known Posey in the context of a sound-dampening project for one of Posey's prior employers. According to Posey's CV, he had experience in industrial operations and with the commercialization of innovative technologies.  He had expertise in noise and vibration control, an area that Sonex was eager to pursue.  Id. ¶¶ 30-31.

Sonex knew that Posey had recently worked as a sales representative for BRD Noise and Vibration Control ("BRD").

Despite the overlap in BRD's and Sonex's interest in noise control products, Sonex did not ask Posey to make any representations about his prior employment in his employment agreement.  The law firm of Winderweedle, Haimes, Ward & Woodman, P.A., of Orlando, Florida ("the Winderweedle firm") represented Posey during his employment negotiations with Sonex.  Posey's employment agreement with Sonex contained a covenant not to compete with Sonex during his employment or for a period of time after the termination of his employment.  Id. ¶¶ 34-35, 37.

The press release announcing Posey's hiring stated:

> We are delighted to have Roger join Sonex as our President. Roger brings a wealth of management and industry turnaround experience to Sonex and with his efforts we look forward to profitable growth as we continue to provide products to the marketplace.  At our 2003 Shareholder Meeting in September, we announced the Company was focusing on business re-positioning, strengthening its internal capabilities, and planning for growth.  Roger will play a major role in the continuing implementation of this strategy.

Id. ¶¶ 38.

Sonex experienced cashflow difficulties in its transition from a research and development firm to a commercialization firm.  Pouring, Ponticas, and Posey all agreed to defer portions of their salary and looked for ways to raise short-term and long-term capital.  They were motivated by their desire to recoup their deferred income, protect the value of their stock holdings, and keep Sonex afloat.  Id. ¶¶ 42-43.

4

Posey sought out a long-time friend and colleague to help in the effort to raise cash:  Jim Z.I. Williams, president of E.I. Williams Steel Division ("EIW") of Toronto, Canada, a manufacturer of noise control products.  Williams offered to try to arrange a $40 million capital investment by a group of Canadian investors.  Williams said that he had a personal relationship with Fred Hunter, a prominent Toronto businessman who Williams thought would be interested in Sonex.  Williams cautioned, though, that any financing would not be available until, at the earliest, the summer of 2004, which was four months away.  Id. ¶¶ 45-47.

In February of 2004, Pouring, Ponticas, Posey, and Williams decided to pursue a private placement of equity marketed to individuals.  The private placement allowed Sonex to raise cash while avoiding SEC and state regulatory requirements associated with public offerings.  They wrote a plan called "Business Content 2004" (hereafter "the Business Plan") to be used as a solicitation piece for the private placement.  Sonex also hired the Winderweedle firm, which had represented Posey in his employment negotiations with Sonex, to prepare documents and to counsel Sonex on the private placement.  Id. ¶¶ 50-53.

The defendants developed a set of talking points emphasizing two themes to appeal to investors:  the first focused on new noise and vibration control technologies,

including a cutting-edge process called active noise concealment. The second message emphasized Sonex's long-term prospects.  The defendants agreed to overstate and exaggerate the prospect of the long-term financing Williams was seeking; they knew that the financing was speculative, but that the best way to entice the private placement investors was to assure them that it was imminent.  Id. ¶¶ 53-54.

The defendants solicited potential investors by telling them that:  1) Sonex was poised to become a leader in active noise concealment, and that Posey would be able to implement the Business Plan because of his expertise in active noise concealment and his experience with firms developing innovative technologies; 2) to achieve that, Canadian investors led by Fred Hunter had committed up to $43 million in loans that were expected to close during the summer of 2004; 3) Sonex sought a short-term capital infusion as a bridge until the financing closed, and was looking to raise a few hundred thousand dollars through a private placement; 4) the company had entered into a strategic alliance with EIW to serve as exclusive United States distributor of EIW's noise control products, which had already led to a purchase order of $200,000 and other qualified sales leads; 5) once the financing arrived, Sonex would implement the business plan and all shareholders would reap the benefits.  Id. ¶¶ 55, 59.

6

Despite what the defendants told potential investors, Sonex never had a strategic alliance with EIW, a set of qualified sales leads, or a $200,000 purchase order.  Williams said he would consider the arrangement, but never committed to it.  The $200,000 purchase order was for a referral Posey had made to EIW; the order was with EIW directly, not with Sonex.  Posey and Williams discussed treating this as Sonex's order, should the exclusive distributor arrangement ever materialize.  Williams admitted that once he learned, in March of 2004, that Posey had a restrictive covenant with BRD and had refused to furnish it to Sonex, he did not further consider the strategic alliance, because he believed that Posey's covenant would prevent Sonex from entering a distribution agreement for EIW's products.  Id. ¶¶ 62-64.

Around February of 2004, Posey approached Bruce Majer, a former colleague living in Pennsylvania, to solicit his investment.  Majer spoke to Posey, Rose, Pouring, Ponticas, and Williams over the next several months, and received the business plan.  Id. ¶¶ 67-68.

Majer was concerned that Sonex had hired Global and the Winderweedle firm without sufficient cash flow to compensate them.  Posey told Majer in several conversations in the spring of 2004 that both firms had agreed to accept stock in lieu of cash for all services.  Sonex's Form 10-KSB for fiscal year 2003,

published around April 2004, stated that Sonex had agreed to pay 1,000,000 shares to an unidentified law firm, and that Sonex had agreed to pay the firm a cash retainer by June 30, 2004.  Posey assured Majer that the Winderweedle firm had agreed to accept only stock as payment for its services going forward.  Majer did not question this representation.  Id. ¶ 69-70.

Majer expressed concern to others at Sonex and received reassurance.  In the spring of 2004 Williams told Majer that the Canadian financing would come through and that it was only a matter of time.  Majer asked Posey whether he had a restrictive covenant from his former employer that might affect his work at Sonex.  Posey acknowledged that he had such a covenant, but said that it was not implicated by his Sonex employment.  In addition, Posey told Majer that the covenant had been reviewed by his attorney, Lipson, and was inapplicable.  Id. ¶¶ 72-73.

Contrary to Posey's representation, Lipson had not reviewed Posey's covenant with BRD.  Lipson, concerned about the status of Posey's restrictive covenant after reviewing Sonex's business plan, asked Posey for a copy of his employment agreement with BRD, which Posey refused to provide.  Lipson then advised Sonex that it should not go through with the private placement and accept money from investors.  Sonex disregarded this advice and proceeded with the private placement.  Id. ¶ 74-78.

On February 23, 2004, Majer traveled to Sonex's office in Annapolis to tour the facility and meet with Pouring, Ponticas, Posey, and Rose.  They discussed the business plan and the private placement, reviewing the talking points:  Posey's qualifications; the imminent Canadian financing; the strategic alliance with EIW and the $200,000 purchase order; and the Winderweedle firm's acceptance of stock in lieu of cash.  Based on these representations, Majer was impressed with Sonex.  He told friends, family members, and colleagues that he was considering an investment, and referred those who expressed interest to the defendants.  Id. ¶ 79-82.

The defendants arranged a series of investor meetings at a hotel conference center in Plymouth Meeting, Pennsylvania, on February 27, 2004, March 26, 2004, and in early April, 2004.  Posey and Rose led the meetings.  They described the company, explained the investment terms, presented a Power Point of the Business Plan, and left a copy of the Business Plan with the prospective investors.  They discussed the major talking points:  Posey's ability to implement the business plan and his experience with active noise concealment technology; the strategic alliance with EIW; the imminence of the Canadian financing; and the stock-payment arrangement with the Winderweedle firm.   Majer attended all three meetings; Fortna attended the first two

meetings; Hermitage representatives came to all three meetings. Id. ¶¶ 83-86.

Majer purchased 1.2 units of private placement equity (240,000 shares of common stock and a warrant to purchase an additional 240,000 shares). Around April 21, 2004, he wired $60,000 to Sonex and delivered a completed and signed subscription agreement and a confidential purchaser questionnaire.[2]   Id. ¶ 88.

Allen Fortna bought 1.4 units (280,000 shares of common stock and a warrant to purchase 280,000 more). Around April 28, 2004, he delivered a check for $70,000 to Sonex, along with a

---

[2]     The plaintiffs do not attach copies of the subscription agreements to their amended complaint. Sonex, Pouring, and Ponticas attached copies to their original motion to dismiss. The United States Court of Appeals for the Third Circuit has held that although "[a]s a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings, . . . an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations omitted). This approach was recently confirmed by the United States Supreme Court, which held that courts analyzing motions to dismiss claims under the PSLRA must examine the complaint in its entirety, as well as documents incorporated into the complaint by reference or matters of which a court may take judicial notice. Tellabs v. Makor Issues & Rts., Ltd., 127 S. Ct. 2499, 2509 (2007).

The subscription agreements form the basis for the plaintiffs' claims of rescission and breach of contract. In addition, they are intimately involved with the plaintiffs' other claims. For example, in order to succeed with their claims of material omissions, the plaintiffs need to show the absence of statements from the materials with which they concede they were provided. The Court will consider the subscription agreements.

completed and signed subscription agreement and a confidential purchase questionnaire.  Id. ¶ 89.

William P. McKinney, George McClennen, Donald E. Wynne, Alan S. Lurty, Jay Feinschil, and Jeffrey J. Craighead formed Hermitage, a Pennsylvania partnership, to make their investment. Through it, they bought 0.9 units (180,000 shares of common stock and a warrant to purchase an additional 180,000).  Hermitage delivered a check for $45,000 to Sonex in July 2004, along with a completed and signed subscription agreement and a confidential purchase questionnaire.  Id. ¶ 90.

Majer and Fortna's subscription agreements are dated April 21, 2004.  Hermitage's subscription agreement is dated July 2, 2004.  In those agreements, the plaintiffs represented and warranted that they were "capable of evaluating the merits and risks of an investment in the Units," that they had "read and understood the Company Information [defined in the agreements to include Sonex's Annual Report on Form 10-KSB for the year ending December 31, 2003]," that in connection with their review, they had "consulted with such independent legal counsel, accountants and other advisers considered appropriate to assist [them] in evaluating [their] proposed investment in the Company," and that they had:

> taken full cognizance of and underst[ood]:
> A) the Company's Annual Report on Form 10-KSB for the year ended December 31, 2003;   . . .

C) the Company's business plan entitled "Business Content 2004";
D) the form of the warrant;
E) this Subscription Agreement;
F) that there are substantial risk factors to be considered in connection with an investment in the Units, including without limitation those set forth in the Company Information;
G) that the Units constitute a speculative investment and involve a high degree of risk, including the loss of the subscriber's entire investment in the Company; and
H) that there are substantial restrictions of the transferability of the shares of Common Stock and the Warrants . . . accordingly, the undersigned may be required to hold the shares of Common Stock and the Warrants comprising the Units indefinitely and it may not be possible for an investor to liquidate an investment in the Company.

Defs'. Mot. to Dismiss Complaint Exs. 2-A, 2-B, and 2-C at 5, 10.[3]

The 2003 Form 10-KSB that the plaintiffs warranted that they had "taken full cognizance of and understood" in the subscription agreements included the following disclosures:[4]

Since its inception in 1980, the company has generated cumulative net losses of approximately $23 million and anticipates continuing to incur operating losses for the foreseeable future. . . .

Operating funds have been raised primarily through the sale of equity securities. . . .

---

[3]     Hereafter Defs'. Br.

[4]     The Court will consider the 2003 Form 10-KSBs for two reasons.  First, these forms are essentially incorporated into the subscription agreements, which the Court has already explained it will consider.  Second, when considering a motion to dismiss in a securities action, a court may "take judicial notice of properly authenticated public disclosure documents filed with the SEC."  Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000). The court in Oran took judicial notice of such documents even though they had not been included in the complaint.

The continued deferral of portions of current wages by the Company's officers cannot be expected to continue indefinitely, and the Company will be required to pay amounts outstanding as soon as cash flow permits. . . .

[A]s of January 1, 2004, the Company's chief financial officer is no longer deferring any portion of his current salary. . . .

[Sonex has a] history of operating losses. . . .

[Sonex's] prospects beyond [approximately June 30, 2004] are dependent upon its ability to enter into significant funded contracts . . . or secure a major capital infusion. . . .

The[] uncertainties [of] . . . the Company's ability to generate sufficient revenue and ultimately achieve profitable operations . . . raise substantial doubt about the Company's ability to continue as a going concern. . . .

The agreement with new legal counsel also requires the Company to remit a cash retainer of $50,000 by June 30, 2004.

Id. Ex. 1 at 15, 16, 35-36, 41.

With $175,000 of the private placement money, Sonex paid operating expenses, including the salaries of the officers. During the weeks following the investments, the investors' confidence waned.  Am. Compl. ¶¶ 91.

Sonex's Form 10-QSB, filed with the SEC in August of 2004, revealed that Sonex had agreed to pay the Winderweedle firm in cash, and that the firm had sent invoices to Sonex in May 2004 and a default notice for $102,000 in June of 2004.[5]  Given the

---

[5]     This form was not attached to the complaint, but, like the Form 10-KSB, forms the basis for many of the plaintiffs' claims.  The defendants attached it to their original motion to dismiss as Exhibit 4, and the Court will consider it.

Winderweedle firm's role in both the private placement and the Canadian financing, the investors were concerned both with the short-term financing and the long-term capital investment.  Id. ¶¶ 96-98.

The Form 10-QSB explained that Sonex disputed the Winderweedle firm's fees and had engaged separate counsel on a pro bono basis.  The form stated that Sonex "believes that the amounts invoiced by [Winderweedle] are far in excess of what is reasonable based on the limited services requested by the Company and the limited work product produced by [Winderweedle]."  It described Sonex's demand for return of the common stock issued to Winderweedle, and Sonex's reservation of rights against the firm. The form concluded:  "While the outcome of this dispute is uncertain and may have an adverse effect on the Company's financial condition, management believes that the Company has a defensible position.  Accordingly, no liability for any amounts related to this dispute has been recorded in the accompanying financial statements as of June 30, 2004."  Def's. Mot. Ex. 4 at 15.

By late in the summer of 2004, the Canadian financing still had not arrived.  When the plaintiffs pressed Williams, he told them that the financing deal was dead by the time Hermitage made its investment in Sonex.  Ponticas had always been skeptical about the financing.  Posey, Williams, and Rose met with Hunter

before the plaintiffs made their investments, and Hunter said he
would consider only an initial investment of $1.5 to $2 million,
not the $43 million promoted to the plaintiffs.  In about March
of 2004, Ponticas and Williams disagreed about how to use the
financing proceeds:  Ponticas wanted to pay off Sonex's
liabilities, but Williams wanted to use the money for Sonex's new
business ventures.  Williams told the other defendants that the
use proposed by Ponticas would "kill the deal."  Am. Compl.  ¶¶
101-05.

        In early April of 2004, the defendants held a
conference call with Fred Hunter, who said that he had been
delayed in considering the financing because of restrictions
imposed by the Patriot Act.  After Hunter hung up, Ponticas said
that he thought the Patriot Act was an excuse and that the
financing would not come through.  At a later board meeting, in
June of 2004, Williams said that he was not prepared to
facilitate a direct loan from the Canadian investors to Sonex.
Rather, the loan would be made directly to Williams or to EIW,
which would re-lend the funds to Sonex at a higher interest rate,
and only if Sonex agreed to escrow the loan proceeds, use the
proceeds only for specified purposes acceptable to Williams (not
for paying down Sonex's debts), and to grant Williams a
substantial amount of stock and warrants.  Rose and Lipson
objected to those terms, and Lipson pointed out that Williams

15

would be breaching his fiduciary duty as a Sonex director if he took the loan on such personally advantageous terms.  Id. ¶¶ 106-10.

In July of 2004, after Sonex had received the check from Hermitage, but before it deposited the check, Rose met with Ponticas and Pouring and told them that he and Lipson both believed that the check could not be lawfully deposited and needed to be returned to Hermitage.  This was necessary, Rose said, because the investors had never been told that:  the financing had been speculative and was now dead; Posey had a restrictive covenant with BRD and refused to furnish it to Sonex, which cast doubt on his ability to lead the company; and that Sonex had a cash obligation to the Winderweedle firm and was now in default.  Sonex ignored Rose's advice and deposited the check. Id. ¶¶ 111-12.

In October of 2004, Sonex announced that Posey was stepping down as President and CEO.  About two weeks later Sonex announced that Posey was leaving the Board of Directors.  The formal announcements did not include a reason for Posey's departure, but the plaintiffs learned that there was a conflict with BRD, Posey's previous employer, about his restrictive covenant, which prohibited him from competing with BRD in the area of sound-dampening and noise management.  While the defendants were soliciting the plaintiffs by stressing Posey's

16

qualifications, the defendants knew or should have known that Posey could not implement the business plan and that if BRD ever pressed the matter, Posey would be forced to resign.  <u>Id.</u> ¶¶ 114-16.

If Sonex had been as the defendants represented, the securities that the plaintiffs purchased would have been well worth what they had paid.  Because Sonex was so far from what the defendants represented it to be, the plaintiff's securities are essentially worthless.  On December 9, 2004, the plaintiffs demanded that Sonex return their investments.  The plaintiffs tendered the equity they had purchased in exchange for a refund of their money.  Sonex, through Pouring and Ponticas, denied their request.  <u>Id.</u> ¶¶ 117-19.

II.    <u>The Amended Complaint and the Motions to Dismiss</u>

The amended complaint contains six counts: Count One, violation of § 10(b) of the Securities Exchange Act of 1934 and 17 C.F.R § 240.10b-5(b), (collectively, "Rule 10b-5"); Count Two, violation of the Pennsylvania Securities Act ("PSA"); Count Three, fraudulent misrepresentation; Count Four, negligent misrepresentation; Count Five, rescission; and Count Six, breach of contract.

Sonex, Pouring, and Ponticas have filed a motion to dismiss the amended complaint, arguing that the amended complaint

fails to state a claim upon which relief can be grated.  Posey also filed a motion to dismiss the amended complaint for failure to state a claim.[6]

The Court will grant the motions to dismiss for failure to state a claim.  The Court concludes that the allegations of misrepresentations and omissions fail under the standards for claims of securities fraud under Rule 10b-5, the PSA, and Pennsylvania common law.  The plaintiffs have not demonstrated that the defendants had scienter, that the misrepresentations and omissions were material, or that the misrepresentations and omissions were the proximate cause of the plaintiffs' losses.  The plaintiffs' allegations of negligent misrepresentation, breach of contract, and rescission also fail to state a claim.

The defendants request an order by the Court directing Sonex to issue share certificates to the plaintiffs for the shares they purchased.  The Court will issue this order.


III.   <u>Analysis</u>

A.   <u>10b-5 Claims</u>

Section 10(b) of the Securities Exchange Act of 1934 forbids the use or employment of any deceptive device in

---

[6]      Posey is <u>pro se</u>.  He purported to move to dismiss the amended complaint on behalf of both himself and Sonex.  Sonex is represented by separate counsel, and the court will consider Posey's motion only as to himself.

connection with the purchase or sale of any security.  15 U.S.C.
§ 78j(b) (2000).  Rule 10b-5 forbids the making of any "untrue
statement of a material fact" or the omission of any material
fact needed to make the statements not misleading.  17 C.F.R. §
240.10b-5 (2004).

Courts have implied a private damages action from the
statute and the rule, and Congress has imposed statutory
requirements on that private action.  The basic elements of the
action are:  1) a material misrepresentation or omission, 2)
scienter, 3) a connection with the purchase or sale of a
security, 4) reliance on the misrepresentation, 5) economic loss,
and 6) loss causation -- a causal connection between the material
misrepresentation and the loss.  Dura Pharm. v. Broudo, 544 U.S.
336, 341-42 (2005).

Rule 10b-5 claims are governed by the Private
Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4
("PSLRA").  The PSLRA heightened the pleading requirements in
private securities actions.  In re Rockefeller Ctr. Props., Inc.
Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002).  It requires
securities plaintiffs to specify with particularity at the outset
of litigation all facts upon which they base their allegations or
upon which they form their belief (if an allegation is made on
information and belief).  15 U.S.C. § 78u-4(b)(1)(B).  They must
"specify each statement alleged to have been misleading [and] the

19

reason or reasons why the statement is misleading." In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1328 (3d Cir. 2002) (quoting In re Advanta Corp. Sec. Litig., 180 F.3d 525, 530 (3d Cir. 1999)).

To survive a motion to dismiss, the misstatements or omissions alleged by a plaintiff must be material to the reasonable investor.  There must be a "substantial likelihood that, under all the circumstances, the [statement or omission] would have assumed actual significance in the deliberations of the reasonable shareholder." In re Aetna, Inc. Sec. Litig., 34 F. Supp. 2d 935, 945 (E.D. Pa. 1999) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).  The issue is whether there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available to that investor. Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 280 n.11 (3d Cir. 1992) (citations omitted).

"[V]ague and general statements of optimism constitute no more than puffery and are understood by reasonable investors as such. . . . Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material." Advanta, 180 F.3d at 538.

The PSLRA also heightened the standard for pleading scienter.  15 U.S.C. § 78u-4(b)(2).  With respect to each act or

omission, a plaintiff must:  1) specify each statement alleged to have been misleading and the reasons why it is misleading; and 2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.  Id., Tellabs v. Makor Issues & Rts., Ltd., 127 S. Ct. 2499, 2508 (2007).  According to the Tellabs Court, the strong inference standard unequivocally raised the bar for pleading scienter.  The inference must be more than merely reasonable or permissible. The Court held that a complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference that could be drawn from the facts alleged.  Id. at 2509.

In its earlier decision the Court concluded that the plaintiffs failed to adequately allege materiality or scienter for any of the defendants' alleged misrepresentations.[7]  The plaintiffs' allegations failed to alter the total mix of information available to investors when considered with the subscription agreements that the plaintiffs signed, in which they warranted that they had read and understood Sonex's 2003 Form 10-KSB.  The only allegations of motive in the complaint were allegations that Pouring, Ponticas, and Posey had deferred

---

[7]    Because the plaintiffs did not make out their claims on scienter or materiality, the Court did not address loss causation in its previous opinion.  The Court will address loss causation in this decision.

portions of their salaries and income and were motivated by a desire to recoup that deferred income and ensure their personal well-being going forward.  An officer's desire to reap the financial rewards of a successful transaction is not sufficient motive to survive a motion to dismiss.  The plaintiffs allegations did not give rise to a strong inference of scienter.

The Court discussed four claims of misrepresentation in its earlier decision.

The first two claims of misrepresentation dealt with the defendants' promotion of Posey as uniquely qualified to implement Sonex's business plan when he was subject to a restrictive covenant with a former employer that would force him to resign.  The Court observed that Posey's qualifications had not been misstated just because he was subject to a restrictive covenant and that Posey's declaration that he had such a covenant made it impossible for the plaintiffs to argue that nondisclosure of the covenant was a material omission.  In addition, the statements that the defendants made about Posey's qualifications constituted puffery.

The third claim addressed the defendants' representations that a loan from Canadian investors was imminent when in fact it was speculative and had no realistic chance of being consummated.  The Court held that an allegation that the

defendants "knew" that the financing was speculative or tenuous was insufficient as an allegation of scienter.

The fourth alleged misrepresentation dealt with the defendants' statements that the Winderweedle firm had agreed to accept payment in stock rather than in cash, when in fact the fee agreement required cash payment, the company had agreed to pay a cash retainer of $50,000, and the law firm had invoiced the company for $102,000 for services rendered.  The Court pointed to the disclosure in Sonex's 2003 Form 10-KSB, which the plaintiffs warranted that they read and understood in their subscription agreements, that the agreement with Winderweedle required a cash retainer.  Sonex's 2004 Form 10-QSB disclosed that Sonex disputed the $102,000 bill.  The Court held that Sonex's obligation to pay the Winderweedle bill was not material because it was contingent upon Sonex's success or failure in disputing the bill.

In addition, the 2003 Form 10-KSB disclosed that Sonex was in financially unstable position:  the company was operating at a loss, it would continue to operate at a loss for the foreseeable future, and the plaintiffs might lose their investments.  Given the magnitude of Sonex's problems, the disputed Winderweedle bill would not have altered the total mix of available information.

The Court will now address the allegations in the amended complaint.  The allegations fit into four categories,

three of which are the same as those used by the Court in its
previous opinion:  Posey's unique qualifications to lead Sonex
and his covenant with BRD; the Canadian financing; and the
relationship with the Winderweedle firm.  The new allegation
involves the strategic alliance with Williams's company EIW and
the purchase order and sales leads that resulted.

### 1.  Materiality

The Supreme Court requires the Court to consider these
allegations in the context of the "total mix" of information
available to a reasonable investor at the time of investment.
Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).  In this
case, as discussed in the Court's previous opinion and above, the
total mix includes the disclosures plaintiffs received from Sonex
in their 2004 subscription agreements.  The plaintiffs signed the
agreements, representing that they were "capable of evaluating
the merits and risk of an investment," that they had "read and
understood the Company Information [including the Annual Report
on Form 10-KSB for 2003]," and that they had "consulted with such
independent legal counsel, accountants and other advisers
considered appropriate to assist [them] in evaluating [their]
proposed investment in the Company."  Def's. Mot. Ex. 2-A, Ex. 2-
B, Ex. 2-C at pp. 5, 10.

24

The 2003 Form 10-KSB disclosed that Sonex was in a financially tenuous position:  it was operating at a loss and it would continue to operate at a loss for the foreseeable future. "Management recognizes that the Company's history of operating losses, level of available funds, and revenue from current and future contracts, in relation to projected expenditures, raise substantial doubt as to the Company's ability to commence generation of significant revenues from the commercialization of the [proprietary technology] and ultimately achieve profitable operations." Id. Ex. 1 at 4.

The amended complaint fleshes out the details of the plaintiffs' allegations, but none of the allegations would so alter the "total mix" of information to state a claim under the PSLRA.

### a.   Posey's Qualifications and the Covenant Not to Compete

The allegations regarding Posey's qualifications and the non-compete agreement are mostly repeated from the first complaint.  As discussed in the Court's previous opinion, Posey disclosed that he had a restrictive covenant.  The plaintiffs have added details about Posey's experience and an allegation that the defendants failed to disclose legal advice from Lipson that Sonex should not proceed with the private placement, in part because of Posey's restrictive covenant.  Lipson had never seen

the covenant.  His advice to Sonex was based only upon what he thought might be in the covenant, and Sonex's decision to proceed despite this advice does not rise to the level of materiality required by the PSLRA.  Am. Compl. ¶¶ 76-77.

> b.   The Canadian Financing and the EIW Strategic Alliance

The plaintiffs allege that the both the Canadian financing and the EIW strategic alliance were dead at the time the defendants represented that the financing was "imminent" and the strategic alliance was a "done deal."  Am. Compl. ¶¶ 81, 87, 126.

As discussed in the Court's previous decision, representations about possible events that are contingent on the actions of a third party are immaterial.  In re Rockefeller Ctr. Props., 184 F.3d at 290; In re CDNow Sec. Litig., 138 F. Supp. 2d 624, 632 (E.D. Pa. 2001).  In addition, the timeline of events laid out in the amended complaint belies the plaintiffs' allegation that the defendants knew that the Canadian financing was dead before the plaintiffs invested.  Between February and April of 2004, Fred Hunter, the leader of the Canadian group, told the defendants that he would consider an initial investment of $1.5 to $2 million, not $43 million, and in early April he told the defendants that he had been delayed in considering and committing to the financing because of the Patriot Act.  In

October of 2004, the plaintiffs allege, "it became apparent that the financing would not be consummated."  Am. Compl. ¶¶ 102, 106, 57.

Plaintiffs Majer and Fortna invested in Sonex in April of 2004; plaintiff Hermitage in July of 2004.  Although the Patriot Act problems and the scaling back of the investment were signs that the financing was in trouble, the allegations in the amended complaint do not lead to the conclusion that the financing was "dead" when the plaintiffs invested.  The subscription agreements signed by the plaintiffs disclosed Sonex's tenuous financial position, and financing contingent on the decision of another outside group of investors does not change the total mix of information available.

The strategic alliance with EIW, like the Canadian financing, is a contingent event.  In addition, phrases like "strategic alliance" or "strategic partner" are promotional language that often constitutes puffery.  See Winer Family Trust v. Queen, No. 05-3622, 2004 WL 2203709 at *8 (E.D. Pa. Sept. 27, 2004) ("Queen's characterization of Smithfield as Pennexx's 'strategic partner' is immaterial puffery that is inactionable under the securities laws").

The plaintiffs emphasize the importance of the alliance with EIW to Sonex's business plan, which included references to "qualified sales leads" from EIW and the $200,000 purchase order.

27

The amended complaint states that Posey had referred a potential customer to EIW, and that that customer had placed a $200,000 order with EIW.  Posey and Williams discussed the possibility of attributing that order to Sonex in the event they reached an agreement where Sonex became EIW's exclusive distributor in the United States, but they never reached a deal.  Like the Canadian investments, Sonex's strategic alliance with EIW and the leads it received never materialized, but at the time the plaintiffs signed their subscription agreements, it was a possibility.  A projection of $200,000 in income in the 4th quarter of 2004, in the face of $23 million in cumulative operating losses, does not change the total mix of information that the plaintiffs had, and is not material.  Am. Compl. ¶¶ 60-64.

### c.   The Winderweedle Firm

        The plaintiffs' allegations about the Winderweedle firm are largely the same in the amended complaint as they were in the first complaint.  The plaintiffs claim that the defendants told them that Winderweedle had agreed to accept stock in lieu of cash for all services.  As discussed in the Court's previous opinion, the materiality of this representation is negated by the disclosure in Sonex's 2003 Form 10-KSB that "the agreement with the new legal counsel . . . requires the Company to remit a cash retainer of $50,000 by June 30, 2004."  Defs'. Mot. Ex. 1 at 41.

The claim from Winderweedle that Sonex was in default could only have been material to Hermitage, because Majer and Fortna signed their subscription agreements before Winderweedle sent the invoices to Sonex.  Sonex disputed Winderweedle's bill, and did not record liability for any amounts related to the dispute, which it believed was "defensible."  As discussed in the previous opinion, Sonex's dispute over the bill makes the obligation contingent, and a disputed liability of $102,000 does not alter the total mix of available information.

The plaintiffs' allegations do not rise to the level of materiality required to state a claim under the PSLRA.


2.   <u>Scienter</u>

Since the Court dismissed the plaintiffs' first complaint, the United States Supreme Court and the United States Court of Appeals for the Third Circuit have issued opinions that address the pleading requirements of the PSLRA.  These decisions clarify the stringent standard for pleading scienter.  "The Court's <u>Tellabs</u> decision removes any doubt the PSLRA's scienter pleading requirement is a significant bar to litigation . . . ." <u>Globis Capital Partners, L.P., v. Stonepath Group, Inc.</u>, No-06-2560, 2007 WL 1977236, at *3 (3d Cir. July 10, 2007).

In <u>Tellabs, Inc. v. Makor Issues & Rts., Ltd.</u>, the Supreme Court held that an inference of scienter in a securities

fraud complaint must be more than just "reasonable" under the PSLRA; it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  127 S. Ct. 2499, 2510 (2007).  The Court outlined a three-step process for considering motions to dismiss under § 10(b):  A district court must accept all factual allegations as true, as with any motion to dismiss.  Then the court considers the complaint in its entirety, including documents incorporated into the complaint by reference, and examines whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter.  Finally, the court considers plausible opposing inferences to determine whether the pleaded facts meet the PSLRA's strong inference standard.  Id. at 2509.

The United States Court of Appeals for the Third Circuit cited the Tellabs pleading standards in its recent decision in Winer Family Trust v. Queen, 503 F.3d 319 (3d Cir. 2007).  The plaintiffs appealed the district court's dismissal of their complaint, claiming that the court had inappropriately resolved disputed facts.  The court of appeals affirmed the district court's decision, finding that the district court had accepted the plaintiffs' alleged facts as true.  Viewing those facts holistically, "a reasonable person would not deem the inference of scienter as cogent and at least as compelling as any

non-culpable inference based upon the omitted facts." <u>Id.</u> at 330.

Winer Family Trust adds clarity to a line of cases addressing scienter in the Third Circuit by applying the <u>Tellabs</u> test. A previous case in the Third Circuit had held that plaintiffs "may establish a 'strong inference' that the defendants acted with scienter either by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." <u>GSC Partners CDO Fund v. Washington</u>, 368 F.3d 228, 239 (3d Cir. 2004). In <u>Tellabs</u>, the Supreme Court specifically reserved the question of whether recklessness could give rise to civil liability under Rule 10b-5. The Court said that although every court of appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, the question of whether recklessness satisfies the scienter requirement was not presented in <u>Tellabs</u>. 127 S. Ct. at 2507 n.3.

In <u>Winer Family Trust</u>, the United States Court of Appeals for the Third Circuit affirmed the district court's finding that the pleaded facts failed to support the requisite strong inference of reckless conduct, much less intentional conduct. The court of appeals said that, "[s]tated differently, Winer's purported inference, that the statements . . . were

31

knowingly false, was not as compelling or as strong as the opposing inference cited by the District Court.  Thus, Winer's inference is neither cogent, nor compelling, nor strong in light of competing inferences."  503 F.3d at 331.  In the Third Circuit, a plaintiff's purported inference that a defendant's actions were reckless or intentional is compared against any non-culpable inference and must be cogent and at least as compelling as that inference in order to satisfy the scienter requirement.

    The facts supporting motive and opportunity to commit fraud must be stated with particularity.  In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir. 1999).  A plaintiff must allege the "who, what, when, where and how" of the events at issue to establish scienter; allegations that the defendants "knew" or "must have known" that statements were fraudulent are insufficient.  GSC Partners, 368 F.3d at 239.  Motives that are common to most directors and officers do not give rise to a strong inference of scienter.  "In every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction.  Such allegations alone cannot give rise to a strong inference of fraudulent intent."  Id. at 237.

    To support a charge of recklessness, a statement must be a material misrepresentation or omission that is "an extreme

departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.  Id. at 239.

a.   Posey's Covenant Not to Compete

As discussed above, the plaintiffs have added claims that Posey represented that the covenant had been reviewed by his attorney, Lipson, when in fact it had not, and that Lipson advised Sonex not to proceed with the private placement because of the potential problems with the covenant.  The plaintiffs claim that Posey's purposes, while selfish, also included a motive to benefit the corporation by raising funds from the plaintiffs.  Am. Compl. ¶¶ 76-77.

Even interpreting the facts as alleged in the light most favorable to the plaintiffs, the inference that defendant Posey was trying to get a job and avoid conflict with his potential employer is more compelling than the plaintiffs' proposed inference that Posey was trying to benefit Sonex by raising money from the plaintiffs through a fraudulent scheme.  Tellabs, 127 S. Ct. at 2504.

Lipson never reviewed Posey's covenant not to compete with BRD, although he represented both Posey (in his employment negotiations with Sonex) and Sonex itself (in its pursuit of the private placement).  Am. Compl. ¶ 74.  His advice to Sonex not to

proceed with the private placement was based on a document he had never seen.  Sonex's decision to disregard its attorney's advice, when the attorney had never seen the document in question, does not rise to the level of scienter needed for fraud under the PSLRA.  Under Tellabs, even assuming that the allegation is true, all the facts as alleged do not give rise to an inference of scienter that is cogent and compelling as any opposing inference that could be drawn.  Nor does it rise to the level of "an extreme departure from the standard of care" as required by the recklessness standard laid out in GDO Partners.  Id. at 239.


b.   The Strategic Alliance With EIW

        The plaintiffs add a claim about a "strategic alliance" with Williams's Canadian firm, EIW, and a putative purchase order for $200,000.  The plaintiffs allege that the Sonex business plan fraudulently promoted a strategic alliance between Sonex and EIW. The Business Plan stated that the two companies "have allied in order to execute a private label arrangement" and that the alliance would facilitate EIW's "gracious feeding of qualified sales leads to Sonex" including a purchase order for $200,000 to be executed in the fourth quarter of 2004.  Am. Compl. ¶ 60. Language in the Business Plan like "strategic alliance" and "sales leads" are classic puffing statements which are immaterial

34

to a scienter analysis.  See Winer Family Trust v. Queen, 2004 WL 2203709 at *8 (E.D. Pa. Sept. 27, 2004).

Defendant Williams acknowledged in August 2004 that the agreement had never been finalized and that the purchase order was placed with EIW rather than directly with Sonex.  The Business Plan was prepared in the spring of 2004, before the plaintiffs signed their Subscription Agreements.  The plaintiffs seek an inference that the individual defendants knew prior to Williams's disclosure that the alliance had not been completed and that they either consciously or recklessly kept this fact from the plaintiffs.  The plaintiffs do not plead specific facts sufficient to support this inference.  Am. Compl. ¶¶ 62, 63, 68, 83-85.

c.  The Canadian Financing

The plaintiffs allege that the Canadian investor, Fred Hunter, considered an initial investment of $1.5 to $2 million, not the $43 million that the defendants claimed.  According to the plaintiffs, Hunter expressed concern about completing the financing because of new regulations in the Patriot Act, and defendant Ponticas wondered whether his hesitation was really due to the regulations and that he did not think the financing would come through.  An initial investment amount does not give rise to an inference that the total investment amount will be the same,

and a deal is not "dead" just because one director thinks it will not come through.  Am. Compl. ¶ 106.

The plaintiffs also allege that a Sonex director, Williams, breached his duty of loyalty to the company by proposing that the Canadian investment should be made directly to him or to his company, EIW, which would lend the money to Sonex at a higher interest rate and under unattractive conditions.  The claims that detail Williams's breach of fiduciary duty do not allege injuries to the plaintiffs, but rather to Sonex itself. This is not a derivative suit; injuries to Sonex must be claimed by Sonex, not the plaintiff investors.  Sonex never accepted Williams's proposal to pursue financing on those terms.  Am. Compl. ¶¶ 108, 110.


d.   The Winderweedle Firm

As discussed above, the plaintiffs add little new information to their allegations about Sonex's arrangements with the Winderweedle law firm.  The plaintiffs reiterate their claims about Sonex's cash obligations to the firm and add the claim that Sonex's attorney (Lipson) and its investment advisor (Rose) recommended that the company not proceed with the private placement because the financing was "dead," Posey had a restrictive covenant, and Sonex had a cash obligation to the Winderweedle firm.  Am. Compl. ¶¶ 77, 112.

36

The cash obligation and timing allegations were
addressed in the Court's dismissal of the complaint.  Assuming
that the plaintiffs' allegation that Sonex disregarded the advice
of their advisers is true, this decision does not rise to the
level of recklessness required for scienter.  All of these
allegations have been addressed above; none of the facts
associated with them lead to an inference of fraud that is more
compelling than an opposing inference.

The plaintiffs have not satisfied the PSLRA's scienter
standard for the claims that they have added to their amended
complaint.


3.   <u>Loss Causation</u>

The defendants also argue that the amended complaint
should be denied because the plaintiffs have not pleaded facts
sufficient to establish loss causation.

In <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336 (2005),
the United States Supreme Court held that a private plaintiff
claiming securities fraud must prove that the defendant's fraud
caused an economic loss.  The Court overturned the United States
Court of Appeals for the Ninth Circuit, which had held that a
plaintiff could establish loss causation by showing that the
price on the purchase date was inflated because of a
misrepresentation.  <u>Id.</u> at 340.  The Court held that an inflated

37

purchase price alone was not sufficient to proximately cause the relevant economic loss.  Id. at 342.

The United States Court of Appeals for the Third Circuit held, even before Dura, that an investor seeking to satisfy the loss causation element must establish that the alleged misrepresentations proximately caused the decline in the security's value.  Semarenko v. Cendant Corp., 223 F.3d 165, 185 (3d Cir. 2000).

Dura was a fraud-on-the-market case, but its analysis is broadly applicable.  The Court noted that when a purchaser resells shares for a lower price than the one she paid, the lower price "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  Dura, 544 U.S. at 343.  The Court cautioned that the securities statutes deter fraud by providing private rights of action, but are not meant to "provide investors with broad insurance against market losses."

The plaintiffs' amended complaint contains one allegation with respect to loss causation:  "if Sonex had been as the defendants represented, the securities purchased by Plaintiffs would have been well worth what they paid for them. Because Sonex was far from what defendants represented it to be,

38

the securities are essentially worthless." Am. Compl. ¶ 118.  As in Dura, the plaintiffs allege that they relied on erroneous information and omissions and therefore paid more than the actual value of the securities.

This allegation does not show proximate cause of economic loss.  The Dura Court noted that "the logical link between the inflated share purchase price and any later economic loss is not invariably strong," pointing to other factors such as a shift in the economy, changes in the industry or the firm, and revised investor expectations.  Dura, 544 U.S. at 342.

An examination of the plaintiffs' allegation of loss causation, even at the motion to dismiss stage, must consider these other factors.  In this case, the plaintiffs were warned in writing about the tenuous nature of Sonex's finances, and they signed statements warranting that they understood those warnings. Sonex's representations about itself included that it was operating at a loss and would continue to operate at a loss for the foreseeable future, and that its senior employees had foregone their salaries.  In addition, there were significant specific restrictions on the stock the plaintiffs purchased:  it was restricted stock and could not be sold for a minimum of two years, and the subscription agreements limited the stock's transferability, warning that "the undersigned may be required to hold the shares . . . indefinitely and it may not be possible for

39

an investor to liquidate an investment in the Company."  The value of the plaintiffs' stock, at the time that they purchased it, included the risk that liquidation of the stock might never be possible.  Defs'. Mot. Ex. 2-A, 2-B, 2-C at ¶ III(e)(1).

The plaintiffs emphasize that <u>Dura</u> was a fraud-on-the-market case and that their case against Sonex is not.  They cite a case from the Ninth Circuit, <u>Livid Holdings Ltd. v. Salomon Smith Barney, Inc.</u>, 416 F.3d 940 (9th Cir. 2005), as parallel to their own.  In <u>Livid</u>, the plaintiffs alleged that the defendants misrepresented whether or not the proceeds of a private equity sale had been received.  There was general cautionary language in the offering memorandum received by the plaintiffs that stated that "the Company may have undergone . . . management changes, ownership changes and business strategy changes."  <u>Livid</u>, 416 F.3d at 945.  The court held that the cautionary language was insufficient warning and that the defendant's misrepresentation concealed the company's dire financial situation, causing the plaintiff to lose the entire value of its investment.  <u>Id.</u> at 949.

The language in the offering memorandum at issue in <u>Livid</u> is far more general than the warnings Sonex included in its 2003 Form 10-KSB and the subscription agreements signed by the plaintiffs.  Those warnings covered Sonex's past operating losses, its current and potential future financial problems, the

40

constraints on its management from liquidity problems, the
prospect that it might never be able to implement its business
plan, and the fact that the shares the plaintiffs were purchasing
might not be transferable.  When the plaintiffs signed the
subscription agreements, they warranted that they understood
"that the Units constitute a speculative investment and involve a
high degree of risk, including the loss of the subscriber's
entire investment in the Company."  Defs'. Mot. Ex. 1 at 16; Ex.
2-a, 2-b, 2-c at § III(e)(I).  In <u>Livid</u>, the court held that the
defendants had concealed the "true nature" of the company.  Sonex
disclosed its true nature to the defendants in the written
materials they were given prior to investing.

> The <u>Dura</u> court observed that although the pleading
rules are not meant to impose a great burden on a plaintiff, it
should not prove burdensome for a plaintiff who has suffered an
economic loss to provide a defendant with some indication of the
loss and the causal connection that the plaintiff asserts.  <u>Dura</u>,
544 U.S. at 347.  The Court cautioned that allowing a plaintiff
to forgo giving any indication of the economic loss and proximate
cause would transform a private securities action into a "partial
downside insurance policy."  <u>Id.</u> at 347-48.

> The plaintiffs' allegations do not establish that the
misrepresentations of the defendants proximately caused their own
economic loss.  The plaintiffs took on a high degree of risk by

investing in a faltering company.  They knew that Sonex was in
financial trouble, that Sonex employees were forgoing their
salaries, and that investors might never be able to sell their
shares in the company.  These specific warnings, which the
plaintiffs warranted they had read and understood when they
signed their subscription agreements, make it impossible for the
plaintiffs to establish, on the facts alleged in the amended
complaint, that the defendants caused their economic losses.  The
plaintiffs decided to invest despite these warnings, and their
economic losses are theirs to bear.

        The plaintiffs have not stated a claim under Rule 10b-
5.  Their pleadings on materiality, scienter, and loss causation
were insufficient.  Therefore, the Court will dismiss Count One,
the plaintiffs' federal securities law claims.


        B.    Other Fraud Claims

        The Court will also grant the motions to dismiss Counts
Two and Three, the allegations of violations of the Pennsylvania
Securities Act ("PSA") and fraudulent misrepresentation.  70 Pa.
C. S. §§ 1-401(a), 501(a).  The PSA, like Rule 10b-5, prohibits
false statements and omissions of material fact in connection
with the sale of securities in Pennsylvania.  The elements of a
claim of fraudulent misrepresentation or omission under
Pennsylvania law are:  1) a representation or omission; 2) which

42

is material to the transaction at hand; 3) made or concealed
falsely, with knowledge of its falsity or recklessness as to
whether it is true or false; 4) with the intent of misleading
another into relying on it; 5) justifiable reliance on the
misrepresentation; and 6) the resulting injury was proximately
caused by the reliance. <u>Gibbs v. Ernst</u>, 647 A.2d 882, 889 (Pa.
1994).

     The elements of common law fraud are "almost identical"
to the elements of Rule 10b-5 claims and claims under the PSA.
<u>Sunquest Info Sys., Inc. v. Dean Witter Reynolds, Inc.</u>, 40 F.
Supp. 2d 644, 659 (W.D. Pa. 1999).  The plaintiffs' claims under
these doctrines fail for the same reason their 10b-5 claims fail.

C.   <u>Negligent Misrepresentation</u>

     The Court will dismiss Count Four, the plaintiffs'
allegation of negligent misrepresentation.  Under Pennsylvania
law, the elements of a negligent misrepresentation claim are:  1)
a misrepresentation of material fact, 2) made under circumstances
in which the misrepresenter ought to have known of its falsity;
3) made with an intent to induce another to act on it; 4) which
results in an injury to the party acting in justifiable reliance
on the misrepresentation. <u>Gilmour v. Bohmueller</u>, 2005 WL 241181
at *3 (E.D. Pa. Jan. 27, 2005).  The plaintiffs say that if the
misrepresentations in the amended complaint were not made

43

knowingly or recklessly, they were made negligently, with a lack
of reasonable care.  Am. Compl. ¶¶ 154, 158.  They restate their
claims from the fraud section of the amended complaint, but, as
in the fraud section, the plaintiffs do not plead facts to
support their contention that the defendants made
misrepresentations with the intent to induce the plaintiffs to
act on them.  Therefore, the negligent misrepresentation claim is
dismissed.


   D.  Rescission and Breach of Contract

        The Court will dismiss Counts Five and Six, Rescission
and Breach of Contract.

        The plaintiffs allege that the subscription agreements
require that the defendants deliver stock certificates to the
plaintiffs.  The defendants have not delivered the stock
certificates, and the plaintiffs seek rescission of the
subscription agreements and specific performance compelling the
immediate delivery of the stock certificates.  Under Maryland
law, which governs the subscription agreements, rescission is a
"radical remedy."  Cutler v. Sugarman Org., Ltd., 596 A.2d 105,
110 (Md. 1991).  This remedy, and the specific performance
requested in the breach of contract claim, are unnecessary
because the defendants have agreed to transfer the share
certificates to the plaintiffs.  The defendants have requested an

order by the court directing Sonex to issue share certificates to the plaintiffs for the shares they purchased.  The Court will grant this request.

      An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRUCE W. MAJER, et al.          :          CIVIL ACTION
                                :
          v.                    :
                                :
SONEX RESEARCH, INC., et al.  :          NO. 05-606

ORDER

AND NOW, this 31st day of January, 2008, upon consideration of the Motion to Dismiss Plaintiffs' Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted as to Defendants Sonex, Pouring, and Ponticas (Docket No. 41), the Motion to Dismiss Plaintiffs' Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted as to Defendants Sonex and Roger D. Posey[8] (Docket No. 48), the Supplemental Memoranda of Law in Further Support of the Motion to Dismiss Plaintiffs' Complaint as to Defendants Sonex, Pouring, and Ponticas, the responses to all of the above documents, and the replies thereto, it is HEREBY ORDERED that:

1.  Sonex, Ponticas, and Pouring's motion to dismiss for failure to state a claim is GRANTED.

2.  Posey's motion to dismiss for failure to state a claim is GRANTED.

_____

[8]   As explained in the Memorandum, the Court considered Posey's Motion only as to himself, and not to Sonex, because Sonex is represented by separate counsel.

3.    Sonex, Ponticas, and Pouring's request for an order to transfer the share certificates to the plaintiffs is GRANTED. Sonex shall issue and transfer share certificates to each plaintiff representing the shares that each plaintiff purchased pursuant to the subscription agreements.

4.    This case is dismissed with prejudice.   The case is CLOSED.


                                   BY THE COURT:


                                   /s/ Mary A. McLaughlin
                                   MARY A. McLAUGHLIN, J.

2